Filed 7/3/23  In re C.L. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re C.L., a Person Coming Under Juvenile Court Law. | B317015 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTIAN L., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP03203G) |
| In re C.L., et al., Persons Coming Under Juvenile Court Law. | B321889 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTIAN L. et al., <br><br> Defendants and Appellants. | (Los Angeles County Super. Ct. No. 21CCJP03203G) |

APPEALS from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Judge.  Affirmed in part and dismissed in part (No. B317015).  Affirmed in part and reversed in part with directions (No. B321889).

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant Christian L. (Nos. B317015 & B321889).

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant Myra L. (No. B321889).

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent (Nos. B317015 & B321889).

_____

In these consolidated appeals, Myra L. (Mother) and Christian L. (Father) challenge various dependency orders regarding their son, C.L., and Mother's six other children. Father challenges the court's order, made pursuant to Welfare and Institutions Code section 300,[1] invoking jurisdiction over C.L. and his siblings; an order removing C.L. from Father; an order requiring Father to submit to drug testing and that his visits be monitored; and an order sustaining a supplemental section 387 petition alleging that the previous disposition, which released all the children to Mother, was no longer sufficient to maintain their safety.  Both Mother and Father challenge the

_____

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

2

removal of the children from Mother's care after the court sustained the section 387 petition. Finally, Father argues that respondent, the Los Angeles County Department of Children and Family Services (DCFS), did not comply with its initial duty of inquiry under the Indian Child Welfare Act and related California statutes (ICWA).

We affirm the court's jurisdictional order, its order removing children from Father, and its order requiring monitored visits for Father. We conclude Father's challenge to the drug testing requirement is now moot, and dismiss this portion of the appeal. We conclude substantial evidence does not support the factual allegations in the section 387 petition, and that the court reversibly erred in sustaining it. We thus reverse both the order sustaining the section 387 petition and the order removing the children from Mother at the section 387 hearing. Finally, we instruct DCFS, upon remand, to comply with its ongoing duty of inquiry under ICWA, to the extent it has not already done so.

## FACTUAL AND PROCEDURAL BACKGROUND

C.L., born in 2019, is the child of Mother and Father. He has six maternal half siblings: S.C. (born 2009), Jo.H. (born 2011), Da.H. (born 2012), K.H. (born 2013), De.H. (born 2015), and Je.H. (born 2016). At the time of the events leading to these dependency proceedings, Mother, five of her seven children (S.C., Jo.H., Da.H., Je.H., and C.L.), and Father all lived in a studio apartment. The apartment had one bathroom, a small kitchen, and a living room. The family slept on one queen size mattress and one blow-up mattress in the living room. De.H. lived with her paternal grandmother. K.H. lived with I.H., her paternal aunt.

## A.  *Family Child Welfare History*

The family participated in voluntary family maintenance services in 2010 based on domestic violence between Mother and Jonathan C., the father of some of C.L.'s half siblings.  In March 2011, the juvenile court sustained a section 300 petition based in part on these same issues between Mother and Jonathan C. After the parents participated in family reunification services, the court terminated jurisdiction in January 2013 and returned all the children to Mother's care.

In October 2013, the court sustained another section 300 petition based on allegations that Mother physically abused S.C.  The court found Mother's physical abuse of S.C. placed S.C. and her siblings at serious risk of harm.  In February 2014, the court sustained a similar petition on behalf of K.H.  The court returned the children to Mother's custody in September 2014 and terminated jurisdiction in July 2015.

The family had numerous other referrals from 2010 through 2020 that were closed as inconclusive or unfounded, none of which involved Father.

## B.  *Referral and Investigation Leading to Instant Dependency Proceedings*

In June 2021, DCFS received a referral reporting that Je.H., then five years old, was running around the family's apartment complex unsupervised and had knocked over a barbeque.  Upon investigation, both Mother and Father denied any abuse, domestic violence, or drug use in the home.  Father reported that he smoked marijuana " 'here and there about once a week[,]' " but denied being under the influence of drugs when he was around the children.  He declined to submit to a drug test unless ordered by the court.

Soon thereafter, a DCFS social worker interviewed S.C., Jo.H., Da.H., and Je.H., who all denied any form of physical abuse, neglect, or inappropriate discipline. According to I.H. (K.H.'s paternal aunt, with whom K.H. was living), Mother had agreed that K.H. should live with I.H. and made I.H. K.H.'s legal guardian approximately three months earlier. I.H. further stated that Mother "labeled [K.H.] as a troubled child" and has a strained relationship with her because, according to Mother, K.H. " 'lies and has called DCFS on [Mother].' "

K.H. told DCFS that Mother and Father "say bad words to each other and stated, 'they will fight talk and hit each other.' . . . 'I've seen them hit each other and gave [*sic*] [Mother] a purple eye.' " She recalled this incident took place at the paternal grandmother's home sometime after C.L. had been born (meaning after 2019). She added that, " 'a long time ago' " when C.L. was a baby, " '[Mother] cut [Father] on his finger and there was blood on the floor.' " She said, " 'I think it was on purpose.' " K.H. also reported that Father had once punched Jo.H. in the stomach. Jo.H. denied this. K.H. reported Mother had hit her with a broom, and that Mother hit S.C. and pulled S.C.'s hair when S.C. was approximately 10 years old. K.H. denied that Mother drank or smoked; she said she had observed Father smoke " 'stuff' " in a brown cigarette.

### C. *Section 300 Petition and Post-Petition Investigation*

On July 12, 2021, DCFS filed a petition under section 300 subdivisions (a), (b)(1), and (j), alleging that the past domestic violence between Mother and Father and Mother's physical abuse of K.H. and S.C. placed all children at risk of harm. None of the children was detained.

5

The continuing DCFS investigation prior to the court's adjudication of the petition yielded the following additional information:

### 1. *August 19, 2021 incident*

In August 2021, an anonymous reporter claimed "[M]other frequently hits the children, especially the child [S.C.]," and that on August 19, 2021, "around midnight, [Father] went to . . . [M]other's home to get his clothes, and when [M]other opened the door, [M]other lunged at him and stabbed him in the hand/arm with an unknown object. The children were crying inside the home, and . . . [M]other was trying to set up [Father] by saying[,] '[Father], you're hurting her.'" The reporting party further stated that "[M]other coaches the children to not disclose [information] to social workers and police, and warns them they will be removed."

Mother denied that she had stabbed Father. She told DCFS that, on the night in question, Father had come to retrieve his belongings. When she asked him to wait outside, he broke a window. Mother called the police but he fled before the police arrived. S.C., Jo.H. and Da.H. likewise denied seeing Mother attack Father on August 19, but reported seeing Father break the window that evening. Jo.H. stated he had seen Father's hand bleeding.

The referral was deemed inconclusive as to the children living with Mother and unfounded as to De.H. and K.H.

### 2. *August 25, 2021 incident*

Later in August 2021, a mandatory reporter related another, separate incident, reporting that "[M]other called law enforcement to report domestic violence with [Father]." Pursuant

to the Los Angeles County Sheriff's Department (LASD) incident report, Mother told law enforcement that she and the children had returned home on the evening of August 25, 2021 to find Father sleeping in the living room of the studio apartment, although she had kicked him out of the home a week earlier (presumably on August 19).  Mother told Father to leave, he refused, and an argument ensued.  Father moved off the bed when Mother put the children to sleep there, and Mother and Father "continued to argue near the front door."  When Mother called 9-1-1, Father "placed [his] right hand on [her] neck . . . and stated, 'Bitch, you're not gonna call the cops.'"  Father then "forcibly took her cell phone . . . from her hand[,] preventing her from calling law enforcement[,] and ran out the front door, out of view."  When asked by LASD deputies whether alcohol or drugs were a factor in this incident, "[Mother] stated [Father] often uses [m]ethamphetamine."

S.C., Da.H., and Jo.H. similarly reported coming home to find Father asleep, and that Mother and Father began arguing after Mother told him to leave.  Jo.H. and Da.H. both reported they saw Father "chok[ing]" Mother "with his right hand."  C.L. and Je.H. also were present but were too young to provide a statement.  Mother "was offered an Emergency Protective Order (EPO) to which she accepted," and "[a]n EPO was obtained . . . with an expiration date of [November 1, 2021]" that prohibited Father from contacting Mother in any way, even via telephone or email, and from coming within 100 feet of her or her residence.

When interviewed by DCFS on two separate occasions a month later, S.C., Jo.H., Da.H., and Je.H. contradicted their earlier statements regarding August 25 and instead denied any domestic violence in the home.  In the two interviews they also

offered different versions of nonviolent events they claimed they had witnessed on August 25.

During a September 29, 2021 DCFS interview, Mother denied that Father ever grabbed her neck, stating, "Held me by my neck? No! I didn't say that to the cops! I don't know why they would write that! No, he didn't choke me!" Mother stated that she did not know whether she planned to get back together with Father. She denied asking for the EPO or that Father had ever abused methamphetamine or any other substances.

### 3.    *Additional DCFS interviews*

The jurisdiction/disposition report included information about four separate interviews with K.H., the details of which are of significance to Father's arguments on appeal.

On July 15, 2021, K.H. was examined at a hospital for suspected physical abuse and neglect, based on K.H.'s earlier statements to DCFS that Mother had hit her and the August 2021 referral describing Mother hitting "the children." The exam yielded no physical findings, but K.H. again reported physical abuse by Mother and further stated, " 'I'm scared of my mom. I don't know why. I like it better with my tia[;] she is nicer. My mom usually hits me with her hand on my body, everywhere. I have my own bed at my tia's but not at my mom's.' "

On August 14, 2021, a dependency investigator interviewed K.H. She again reported that Mother used to hit her and S.C. With respect to domestic violence, "[K.H.] stated that she knows what domestic violence is as she has seen . . . '[M]other and [Father] argue and [she] [has] seen [Father] hit [Mother]. [She] [has] seen when [Father] will get violent as [she] saw when [Father] punched her brother [Jo.H.] as well in the stomach.' "

8

DCFS again interviewed K.H. on August 31, 2021 at I.H.'s house. During the interview, K.H. stated that the first time she met Father, it was when she was still living with Mother, and Mother picked her up from school accompanied by Father. While in the car, Mother and Father began arguing and Father hit Mother in the face.

During a September 13, 2021 forensic interview, K.H. stated Mother would " 'whoop' " her with a belt " 'on [her] stomach and [her] butt' " but not anymore because she lived with her " 'Tia.' "

DCFS also interviewed De.H., who confirmed she did not live with Mother. De.H. also corroborated that Mother previously "sometimes" hit S.C. and K.H., but that when the family all lived with her "[G]randma," Mother did not hit anyone because "[G]randma" would get mad at Mother. At a hospital abuse and neglect examination approximately a month later, De.H. had no signs of physical abuse and told the examiner that she was not fearful of anyone "except [Mother's] boyfriend [Father] [stating,] 'I don't like him. He is the meanest person. I'm scared of him.' "

When DCFS interviewed Father on September 30, 2021, he denied all of the allegations of domestic violence. DCFS asked Father twice whether he had taken Mother's cell phone to prevent her from calling the police, and Father did not answer. During the interview, Father again refused to drug test without court order. He contradicted his earlier statement that he smoked marijuana, saying, " 'I smoked weed a long time ago, I dropped it though.' " Father stated he did not currently have a home address, as he was sleeping in the homes of family and friends. He admitted to talking to Mother as recently as a week prior.

9

### 4. *Father's criminal record and law enforcement reports*

Father's criminal record includes an arrest in 2017 for being under the influence of an illicit substance, two arrests in 2019 for possession of a controlled substance, a 2019 conviction for assault with a deadly weapon, and a September 2020 arrest for possessing drug paraphernalia. One of Father's 2019 arrests resulted from police stopping Father while he was driving a car with five children under the age of 10 years in the backseat, none of whom were in safety seats. Police found open beer bottles in the car—some empty, two half full and cold to the touch. A pat down revealed a plastic baggie containing what appeared to be methamphetamine, as well as ecstasy pills. During another arrest in September 2020, Father disclosed he had drugs in his waistband and admitted to smoking methamphetamine once or twice a week.

### 5. *September 2021 altercation between Father and Alfredo H.*

In September 2021, the maternal grandmother contacted DCFS and reported that she had learned of an incident at Mother's house involving Father and Alfredo H., the father of two of Mother's children. She reported that Father and the paternal grandmother had gone to Mother's home to pick up C.L., when Alfredo H. arrived around the same time to pick up his children, and the two men had an altercation. She did not know if the children had witnessed the incident. Mother told DCFS Father had met Alfredo H. that day, but denied anything untoward happened between the two men.

10

### D.    *C.L.'s Detention from Father Before the Jurisdiction/Disposition Hearing*

On October 26, 2021, based on DCFS's ex parte request, the court detained C.L. from Father.  The court granted Father monitored visits, but required the visits be monitored "by a DCFS approved monitor" and specifically that "Mother is not to monitor [F]ather's visits."

### E.    *Jurisdiction/Disposition Hearing*

At the December 2, 2021 combined jurisdiction and disposition hearing, the court received into evidence DCFS reports containing the information outlined above.  In addition, DCFS filed a Last Minute Information attaching copies of November 2021 text messages between Mother and Father.  In the text messages, Mother tells Father to leave her alone and castigates him for having impregnated another woman, but in a follow-up message, she apologizes, writing:  " '[It] is all my fault. I miss you.' "

The court sustained the petition based on domestic violence between Mother and Father and Mother's physical abuse of K.H. and S.C.

The court removed C.L. from Father's custody, and ordered family maintenance services for Mother and enhancement services for Father, including parenting classes, individual counseling, and a DCFS-approved domestic violence program for both parents.  It also ordered Father to undergo five consecutive drug tests.  The court granted Father monitored visits with C.L., but permitted only DCFS-approved monitors and the paternal

11

grandmother[2] as monitors.  The court further ordered the parents to communicate via Talking Parents.  The disposition order did not include the explicit restriction, included in the detention order, prohibiting Mother from serving as a monitor. Mother was, nonetheless, not a permitted monitor, as she was not DCFS-approved.

By this time, Mother's EPO had expired, but Mother did not request, and the court did not impose, any restrictions on Mother and Father's interactions other than requiring that they communicate using Talking Parents.

Father timely appealed the December 2021 jurisdiction and disposition orders.

## F.    *Section 342 Petition and Restraining Order Based on Alfredo H.'s Domestic Violence*

On January 15, 2022, Alfredo H. assaulted Mother by physically dragging her from his parked car and hitting her repeatedly in the face, causing a laceration to her forehead that required approximately seven stitches.  Mother called law enforcement, but Alfredo H. fled before the officers arrived. Two days later Alfredo H. and a friend arrived uninvited at Mother's apartment after 11:00 p.m.  When Mother called 9-1-1, Alfredo H. grabbed her phone and ran out of the apartment.

On April 5, 2022, the court sustained a section 342 petition based on domestic violence between Mother and Alfredo H.  The court found that "there [we]re reasonable services available to prevent removal," and "[i]n light of these services[,] the [c]ourt

---

[2] The order required DCFS to assess the paternal grandmother as a potential monitor.  DCFS subsequently did so, and approved the paternal grandmother as a monitor for visits.

[found the] release of the child[ren] to [Mother] would not be detrimental to [their] safety, protection, or physical or emotional well-being."

G.    *Removal from Mother and Section 387 Supplemental Petition*

1.    *Evidence regarding Mother and Father's continuing contact*

In early to mid 2022, DCFS received reports that Father might be frequently visiting and/or living with Mother at her home.

In a March 2022 report, DCFS related Father again telling a DCFS social worker that he "still talks to [M]other about their baby [C.L.] on the phone." Father also told DCFS he and Mother were not in a relationship and " 'just talk for the baby.' "

On April 13, 2022, an anonymous caller informed DCFS that "[M]other[']s ex[-boyfriend] has been staying in the apartment with [M]other." The caller "stated she took [a] photograph of [Father's] car in [the] parking structure and provided [it] to" DCFS.

DCFS reported to the court that around April 25, 2022, I.H. texted DCFS alleging Mother had allowed Father to have contact with C.L. and attaching as support for this assertion a Facebook photograph, dated April 12, of Mother, Father, and C.L. together.

When confronted by DCFS with the photograph, Mother admitted its genuineness and explained it was taken in January 2022 in a park during a visit between Father and C.L., monitored by the paternal grandmother. Mother explained that she did not stay for the visit but only took the picture and left. She denied reports that she and Father were living together. When Father was questioned about the photograph, he admitted that he and

13

Mother were "cordial and took a picture together at one of the visitation days."

When interviewed by DCFS in late May 2022, S.C., Jo.H., Da.H., and Je.H. all denied that Father lived in their home or had any contact with them. K.H., however, reported she saw Father's shoes " 'were still there [at Mother's home]' " on one occasion in March 2022. The children's therapist informed DCFS that she believed Mother was "coaching" the children in their statements to DCFS.

According to I.H.'s interview, "[Mother] had called [Alfredo H.] and [Alfredo H.'s] girlfriend using [Father's] Facebook." Alfredo H. reported this as well. Alfredo H. and I.H. both reported that after the January 19, 2022 domestic violence incident between Alfredo H. and Mother, Alfredo H. started getting harassing phone calls from both Mother and Father.

Finally, the DCFS report relayed that LASD deputies had come to Mother's house on April 19, 2022 in response to an assault with a deadly weapon emergency call. Upon their arrival, however, Mother told the deputies that "nothing was occurring at her residence" and that she had allowed an unknown female to use her cell phone to call the fire department, but the unknown female then left. While conducting the interview with Mother, the deputy noticed a blood trail. The deputy then found a man in the bathroom who identified himself as "Jesus Duran." Upon questioning, the man explained that he had been attacked on the street and ran to "his friend's house" (Mother's residence) to seek help, at which point Mother called the fire department for assistance. "Jesus Duran" is also the false name Father gave law enforcement when he was arrested in June 2019. The LASD

14

report does not indicate that anyone other than Mother and "Jesus Duran" were present during the time LASD deputies were at Mother's home.

## 2. *May 2022 temporary removal of children from Mother*

On May 5, 2022, DCFS filed an application requesting temporary removal of all children from Mother, pending a hearing, "due to concerns regarding failure to protect the children from [Father] or comply with court orders. . . . [M]other has allowed [Father] to have unlimited access to all the children. There is photographic evidence of . . . [M]other and [Father] together, and it was reported that he is residing in the home." The court granted the temporary removal order and, on May 6, 2022, DCFS removed the children from Mother. DCFS placed S.C., Jo.H., Da.H., Je.H., and C.L. in the home of nonrelative foster parent A.T. The court did not modify De.H. and K.H.'s placement with the maternal grandmother and I.H., respectively.

## 3. *Section 387 petition*

On May 10, 2022, DCFS filed a section 387 petition seeking removal of the children from Mother based solely on Mother's alleged failure to comply with the juvenile court's orders regarding visitation by allowing Father to live in the home and have unlimited contact with the children.

## 4. *Reports submitted in advance of the section 387 hearing*

Reports submitted in advance of the section 387 hearing contained the information outlined above regarding suspected contact between Mother and Father and the photograph of Mother, Father, and C.L. They also relayed DCFS concerns

that Mother had not gained sufficient insight into the cycle of domestic violence. Finally, the reports included an update on the parents' progress with their respective court-ordered services. Mother had participated in family preservation services from December 2021 until the children's detention in May 2022. The preservation services provider acknowledged that Mother and the children were cooperative but were still addressing various issues. Mother had completed individual counseling and a 12-week domestic violence class. Father "had not enrolled in services but had already received referrals . . . [and] declined additional referrals." Between December 2021 and February 2022, he had submitted to all five court-ordered drug tests, with negative results.

## H. *Section 387 Hearing*

At the disposition portion of the section 387 hearing, all the children's counsel joined DCFS in arguing that the petition should be sustained. The court agreed and sustained the sole count in the petition, which provided as follows: "[M]other . . . failed to comply with the juvenile court orders in that . . . [Mother's] male companion, [Father,] . . . is to have monitored visits by a DCFS approved monitor and that [M]other was not to monitor . . . [F]ather's visits. On multiple occasions, . . . [M]other has allowed . . . [F]ather to have unlimited contact with the children without an approved DCFS monitor present. . . . [Mo]ther's failure to comply with juvenile court orders endangers the children's physical health and safety, and places the children at risk of serious physical harm and damage." (Capitalization omitted.) The court stated its "serious concerns about Mother's protective capacities, her abilities to provide a safe home"

16

because "the evidence supports a finding that . . . Mother has allowed [Father] to have unfettered access to these kids."

The court also found that "by clear and convincing evidence [that] there is substantial danger if [the] children were returned home to the mother's home to their physical health, safety, protection, physical and emotional well-being" and that "[r]easonable efforts [had] been made to prevent removal." The court ordered the children to remain removed from Mother and that DCFS suitably place them.

Both Mother and Father timely appealed the June 2022 orders.

On its own motion, this court consolidated Father's appeal of the December 2021 orders with Mother's and Father's appeals of the June 2022 orders.

## DISCUSSION

In appeal No. B317015, Father challenges: (1) the jurisdictional findings under the section 300 petition, (2) the removal of C.L. from Father's custody, (3) the requirement that Father submit to drug tests, and (4) the requirement that his visits with C.L. be monitored. In appeal No. B321889, (1) Father challenges the order sustaining the section 387 petition; (2) Both Mother and Father challenge the removal of the children from Mother's care; and (3) Father further contends that the dispositional orders, if not reversed, must be conditionally affirmed and the court instructed to order further inquiry because DCFS did not comply with its initial duty of inquiry under ICWA.

17

## A.    *Father's Jurisdictional Arguments*

Father challenges the court's assertion of jurisdiction over C.L.  He argues that substantial evidence does not support that Mother and Father engaged in domestic violence in the presence of the children, and that even if it did, substantial evidence does not support that, *at the time of the jurisdictional hearing,* past domestic violence between Mother and Father put C.L. at risk of harm.

In reviewing for substantial evidence, "[w]e do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding."  (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Applying that standard, we conclude the domestic violence allegations are both supported by substantial evidence and sufficient to support section 300 jurisdiction.  We therefore need not reach Father's additional challenge to the court's jurisdictional findings based on Mother physically abusing C.L.'s siblings.  (See *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["[t]he reviewing court may affirm . . . if the evidence supports the decision on any one of several grounds"]; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [same].)

### 1.    *Substantial evidence supports the finding that the children witnessed domestic violence between Mother and Father*

Father contends that substantial evidence does not support the court's finding of domestic violence between Mother and Father in the presence of the children.  Specifically, Father

18

argues that five of C.L.'s six half siblings deny ever witnessing any domestic abuse, and the only child that gave a contrary report, K.H., was not believable because she made inconsistent statements and had a motive to lie.

But Jo.H., Da.H., and Mother all initially reported witnessing domestic violence in the children's presence. Although they later denied it, the court was free to believe their first version of events. As to K.H., K.H.'s statements are not so inherently improbable that they were unworthy of belief. Likewise, the court was free to believe K.H. despite her alleged lying and motive to prevaricate.

### 2. *The domestic violence is a legally sufficient basis to establish jurisdiction*

"Exposure to domestic violence may serve as the basis for dependency jurisdiction. (*In re R.C.* (2012) 210 Cal.App.4th 930, 941 . . . .) ' " 'Both common sense and expert opinion indicate spousal abuse is detrimental to children.' " ' [Citations.]" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602–603 (*Cole L.*).) We acknowledge, as Father asserts, that past violence alone is not sufficient to support jurisdiction. Rather, the evidence must show that, as of the time of the jurisdictional hearing, the domestic violence is likely to reoccur and to place the child at "substantial risk" of "serious physical harm." (§ 300, subds. (a) & (b); see *In re C.V.* (2017) 15 Cal.App.5th 566, 572 ["[j]urisdiction 'may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur' "]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 ["[w]hile evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm," italics

19

omitted], abrogated on another ground by *In re R.T.* (2017) 3 Cal.5th 622.)

Father argues that the evidence does not support that past domestic violence between Mother and Father creates the requisite current risk to the children, because the record at most reflects minor incidents of violence and, in any case, does not support that they were witnessed by the children. We disagree with both assertions based on the evidence we described earlier. As discussed, that evidence is sufficient to support a finding that the children witnessed domestic violence between Mother and Father. It is also sufficient to support, based on Mother, Jo.H., and Da.H.'s initial accounts of the August 25 incident, that the violence included Father "chok[ing]" Mother—far from a minor act of violence.

Father's reliance on *Cole L., supra*, 70 Cal.App.5th 591, is misplaced. In *Cole L.*, the Court of Appeal reversed the lower court's assumption of jurisdiction because the record reflected only a single minor episode of domestic violence which took place outside the presence of the children. (*Id.* at p. 606.) But unlike in *Cole L.,* the instant record contains evidence of multiple instances of domestic violence. And here, also unlike in *Cole L.*, there is sufficient evidence that the children witnessed the violence. Other cases Father cites in which a court found insufficient evidence of current risk are distinguishable because they all involve domestic violence that occurred a year or more before the court asserted jurisdiction. (See *In re Jesus M.* (2015) 235 Cal.App.4th 104 [three years]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [two to seven years].) Here, violence occurred less than six months prior to the jurisdiction hearing.

Thus, we conclude substantial evidence supports the court's conclusion that Mother and Father's history of domestic violence created a current risk of harm to the children at the time of the jurisdictional hearing sufficient to support juvenile court jurisdiction.

**B.** ***The Record Supports C.L.'s Removal from Father***

Father next argues the court failed to make the requisite factual findings to support removal of C.L. from his care, and, in any event, substantial evidence would not support such findings.

Under section 361, subdivision (c)(1), a juvenile court may remove a child from a parent's physical custody where it finds, by clear and convincing evidence, that there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child, or there would be if the child were returned home, and there are no reasonable means to protect the child without removal from the parent's physical custody.  (§ 361, subd. (c)(1).)  Before the court orders the child removed pursuant to section 361, "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e).)

"Due process requires the findings underlying [an] initial removal order to be based on clear and convincing evidence."  (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530.)  Where, as here, we are presented with "a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of

fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005; *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)

### 1. *Requisite risk of harm to support removal*

To establish the requisite level of risk to a child to justify removal from a custodial parent, "[t]he parent need not be dangerous and the [child] need not have been actually harmed . . . . The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.) "[T]he juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

Father argues that, considering the record as a whole, the domestic violence between Mother and him was insufficient to establish the requisite level of risk to justify removal, in particular given the heightened "clear and convincing" burden of proof below and the need for the risk to be established at the time the child is removed. He argues the violence did not result in any physical injuries, and that C.L., although present during at least one of the altercations, was not within the zone of danger. According to Father, such nonextreme violence in which C.L. was not at risk of being physically injured is insufficient to establish the requisite level of risk of harm to C.L. three months later.

But as noted in response to similar arguments discussed above, the record *does* contain substantial evidence that C.L. and the other children were in the zone of danger created by Mother and Father's domestic violence: There is evidence that C.L. was present in the studio apartment during the August 2021 incident,

22

and other children present indicated (at least at one point) that they witnessed the violence as well.

As to currentness of the risk at the time of the initial dispositional hearing, we note that the August 25, 2021 incident—during which Father "chok[ed]" Mother—occurred *after* DCFS and the juvenile court had already been involved with the family for several months, as did the altercation between Father and Alfredo H. in September 2021. The passage of another three months without incident—during most of which time Father was restricted by an EPO protecting Mother—does not undermine the court's implied conclusion that the August and September 2021 incidents supported a current risk of harm to C.L. at the time of the December 2021 hearing.[3]

Moreover, in addition to the evidence of domestic violence episodes, substantial evidence also supports that Father could not be trusted to care for C.L. based on his use of illegal drugs. According to Mother, Father regularly smoked methamphetamines and had done so as recently as August 25, 2021, approximately four months before the jurisdiction hearing. Further, the disposition hearing record reflected Father's drug-related criminal history dating back to 2017. Indeed, during one arrest in September 2020, Father admitted to the officers that he smoked methamphetamine once or twice a week, and the police found methamphetamine on his person during one of his 2019

---

[3] Father also briefly argues that, to the extent there was a risk of harm to C.L. based on the parents' domestic violence history, it existed when C.L. was in Mother's care as well. But this is a basis on which one might argue the court's order permitting C.L. to be released to Mother was error—not a basis for arguing that the court erred in removing C.L. from Father. (See *In re I.R.* (2021) 61 Cal.App.5th 510, 521, fn. 6.)

arrests.  Further, Father gave DCFS inconsistent information regarding his marijuana use, initially stating that he smoked marijuana on a weekly basis but months later, in an October 2021 interview with DCFS, indicating he had stopped smoking marijuana " 'a long time ago.' "  (See *In re Lana S.* (2012) 207 Cal.App.4th 94, 105–106 ["lengthy history of drug abuse, denial of any drug problem, [and] refusal to voluntarily drug test and enter drug treatment, and her reference to her live-in boyfriend as a heroin addict" constituted substantial evidence supporting removal from Mother].)

Thus, Father's history of drug use, when combined with the domestic violence, provide a basis on which the court could reasonably infer that, as of December 2021, allowing C.L. to be in Father's custody posed a risk to C.L.'s safety and well-being of sufficient magnitude to satisfy section 361, subdivision (c).

### 2. *The court's failure to make a finding supporting lack of alternatives to removal was not prejudicial*

Father argues that, even if substantial evidence supports the requisite level of risk to support removal, it is undisputed that the court failed to make the statutorily-mandated findings regarding whether reasonable means other than removal could have neutralized that risk, thus requiring us to reverse for the court to make the necessary findings.  (See § 361, subd. (e).)  Such failure, however, constitutes reversible error only if it is " ' "reasonably probable" ' " the Father would have achieved a more favorable result, had the court made such findings.  (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1067; see *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [failure to make required findings under § 361, subd. (e) is harmless if " 'it is not reasonably

probable such finding, if made, would have been in favor of continued parental custody' "].)  Here, it is not reasonably probable that, had the court made the required findings, it would aid Father.

Father argues that the court and DCFS's ongoing supervision were alternatives to removal sufficient to protect C.L.  We disagree.  In the time between DCFS filing the petition and the hearing at which C.L. was ordered removed from Father, DCFS was already supervising the family, yet at least two additional incidents of domestic violence occurred involving Father, for which at least some of the children were present.  This evidence supports that DCFS and/or juvenile court supervision would be insufficient to neutralize the risk to C.L. from further domestic violence incidents or insulate C.L. from Father's dangerous drug use.

In these ways, substantial evidence supports that no reasonable alternative means could protect C.L. from Father, and the record does not present "a reasonable chance, more than an abstract possibility" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, italics omitted) that had the court made the requisite findings regarding reasonable alternatives to removal, it would not have removed C.L. from Father.

### C.    *The Drug Testing and Monitored Visitation for Father*

Father next challenges the requirement that he submit to five on-demand drug tests, and complete a drug treatment program if he misses any of the tests or tests positive.  Father has already submitted to the five tests and received all negative results, so this portion of his appeal is moot.  (See *In re D.P.* (2023) 14 Cal.5th 266, 276 [A case is moot when it is

" ' "impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' . . . the plaintiff must complain of an ongoing harm [that is] . . . redressable or capable of being rectified by the outcome the [appellant] seeks"].)

Father also argues the court erred in requiring, as part of the December 2021 dispositional order, that his visits be monitored. We disagree.

"The juvenile court may make 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child.' " (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311, quoting § 362, subd. (a); see § 362, subd. (d).) The court has broad discretion to fashion such orders as are in the best interests of the child, and is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. Father argues that the court's visitation order reflects an abuse of discretion for effectively the same reason he argues the court's order removing C.L. from Father should be reversed: that substantial evidence does not support Father either abused drugs or engaged in domestic violence to a sufficient extent. We reject this argument for the same reasons we reject it in our analysis of the court's removal order above.

### D.   *Section 387 Petition and Removal of Children From Mother*

Section 387 provides the proper vehicle to invoke when DCFS seeks to change the previously ordered placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161 (*T.W.*).) Section 387 requires that "[f]irst,

26

one of the parties must file a supplemental petition setting forth 'a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the . . . protection of the child . . . .' (§ 387, subd. (b) . . . ; see Cal. Rules of Court, rule 5.560(c); [citations].)" (*In re Brianna S.* (2021) 60 Cal.App.5th 303, 312 (*Brianna S.*), italics omitted.) Because the court has previously taken jurisdiction over the child, a section 387 petition need not allege facts sufficient to support jurisdiction. (See *T.W., supra*, at p. 1161.) "Second, the court must convene a 'noticed hearing' within 30 days of its filing of the supplemental petition and the party filing the petition must give notice of the petition at least five days in advance of the hearing where . . . the child remains in [his or] her current custody placement. (§ 387, subd. (a); see §§ 297, subd. (b)(1), 290.2, subd. (c)(1); Cal. Rules of Court, rule 5.565(c)(1).) [¶] Third, the court must decide whether (1) the allegations in the supplemental petition are true, and (2) whether it is appropriate to change or modify the previous placement order by removing the child from her current placement." (*Brianna S., supra*, at p. 312.)

In the first step—assessing whether the factual allegations of the supplemental petition are true and the previous disposition has been ineffective in protecting the child—the court must follow the procedures for jurisdictional hearings, and this phase of the hearing is thus referred to as the jurisdictional phase, although it cannot establish additional bases for juvenile court jurisdiction. (§ 387, subd. (b); Cal. Rules of Court, rule 5.565(e)(1); *In re Jonique W.* (1994) 26 Cal.App.4th 685, 691.)

If the court finds that the petition allegations are true, the court progresses to the dispositional portion of the hearing,

27

at which it considers whether removal is proper. (Cal. Rules of Court, rule 5.565(e)(2); *In re H.G.* (2006) 146 Cal.App.4th 1, 11; *In re Javier G.* (2006) 137 Cal.App.4th 453, 461 (*Javier G.*).) Where, as here, "the section 387 supplemental petition seeks to remove the child from her 'parent' or 'guardian,' " in assessing the need for removal at the dispositional phase of the section 387 hearing, the court must assess whether the evidence supports the findings necessary to justify removal under section 361, subdivision (c). (*Brianna S., supra*, 60 Cal.App.5th at p. 312; *Javier G., supra*, 137 Cal.App.4th at p. 462; *T.W., supra*, 214 Cal.App.4th at p. 1163; but see *In re A.O.* (2010) 185 Cal.App.4th 103, 111–112 [not so requiring].)

Father argues that substantial evidence does not support the factual allegations in the section 387 petition, and thus the court erred in sustaining it. In addition, Mother and Father both argue that, even if the court properly found the allegations in the petition true and proceeded to the dispositional phase of the hearing to determine whether removal was appropriate, substantial evidence does not support the circumstances necessary to justify removal under section 361, subdivision (c).

We agree that substantial evidence does not support the factual allegations in the section 387 petition. Because we conclude this error was prejudicial, we reverse both the order sustaining the section 387 petition and the order removing the children from Mother that followed.

The section 387 petition alleged that the previous disposition permitting the children to remain with Mother was no longer sufficient to protect the children, because Mother and Father had violated court orders regarding monitored visitation, thereby allowing Father "to have unlimited contact with the

28

children without an approved DCFS monitor present." This is the entirety of the factual basis for the petition.

The evidence does not support that Mother and Father violated any court order regarding visitation or Father's contact with the children. The only such visitation order in place required that Father's visits with C.L. be supervised by a DCFS-approved monitor or the paternal grandmother, once approved by DCFS (as the paternal grandmother ultimately was). This order thus prohibits Mother, who is not an approved monitor, from monitoring Father's visits with C.L. But it does not restrict Mother's presence during Father's visits, as long as the visits are properly monitored. Nor does the requirement that Father's visits be supervised by a DCFS-approved monitor restrict Father's ability to be near C.L., Mother, or Mother's other children during a properly monitored visit. The photograph of Mother with Father and C.L. thus is not evidence that Mother violated an order regarding visitation, because it does not inform whether a monitor was present or whether such monitor was DCFS-approved.

Nor is there evidence in the record that Mother was allowing Father "unlimited access" to any of the children. Indeed, there is no evidence of any interaction between Father and any of the children during the period between the December 2021 dispositional order placing the children with Mother and the adjudication of the section 387 petition in June 2022, save the photograph of Mother, Father, and C.L. and evidence of properly monitored visits between Father and C.L. DCFS notes that the children's therapist was concerned Mother was coaching the children in their statements to DCFS. But even assuming the court found the children's statements that they had no

29

contact with Father not credible on this basis, such lack of credibility would only prevent the statements from serving as evidence the children had not had contact with Father—not transform the statements into evidence that the children actually *did* have such contact.

The evidence supporting the petition provides a basis on which the court could infer contact between Mother and Father; for example, K.H.'s statement that she noticed Father's shoes at Mother's home, the LASD incident report regarding "Jesus Duran," or Facebook activity suggesting Mother and Father were in contact. Such contact would violate the court's order that Mother and Father communicate solely via the application Talking Parents. (The EPO against Father had expired in November 2021, and thus no longer restricted them.) But contact between Mother and Father—even contact that violates a court order regarding how they are to communicate—is not a basis for a reasonable inference that Father had any access to the children. Rather, it is a basis for mere speculation to that effect. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 217 [" ' "inferences that are the result of mere speculation or conjecture cannot support a finding," ' " italics omitted].) Nor is it a basis on which we can conclude—at least not without additional allegations establishing that this continuing contact placed the children at risk—that the court's previous order permitting the children to remain with Mother was insufficient to protect them. (See *In re W.O.* (1979) 88 Cal.App.3d 906, 910 ["Violations of court orders are not to be encouraged and violators may be appropriately punished. Taking away one's children is not an appropriate punishment"].) Thus, substantial evidence does not support

30

the specific factual allegations in the section 387 petition, and the court's order sustaining the petition was error.

DCFS urges that we may affirm based on substantial evidence supporting that the previous disposition was insufficient to keep the children safe in ways *not* alleged in the section 387 petition. Specifically, DCFS points to the continuing domestic violence the court could infer occurred between Father and Mother based on the LASD report regarding "Jesus Duran" and the January 2022 domestic violence of Alfredo H. This, combined with the continued contact between Mother and Father in violation of the Talking Parents order, could potentially provide substantial evidence to support a finding that Mother and Father's continuing domestic violence and continuing contact in violation of court orders rendered the previous disposition insufficient to protect the children. But the court never made such a factual finding, and "[w]e cannot affirm a jurisdictional finding that was never alleged or made in the trial court." (*In re V.M.* (2010) 191 Cal.App.4th 245, 253.) Nor can such a finding by the court below be implied, given the extremely narrow factual allegations in the petition. "To be sure, ' " 'a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason.' " ' [Citation.]" (*Cole L., supra*, 70 Cal.App.5th at p. 606.) But DCFS is "asking us not to affirm a decision by the court that is by law correct on different grounds." (*Ibid.*) Rather, we are asked "to make an entirely new decision based on a factual finding"—namely, a finding that domestic violence was continuing between Mother and Father as recently as April 2022—"not made by the juvenile court. That decision and finding were for the juvenile court in the first instance, not this court." (*Ibid.*)

31

Moreover, affirming based on the evidence supporting factual allegations never made below[4] would deny Mother the process she is due under section 387: namely, notice and an opportunity to be heard on the facts, based on which section 387 authorizes the court to modify its previous order and potentially remove her children from her. "A parent's fundamental right to adequate notice and the opportunity to be heard in dependency matters involving potential deprivation of the parental interest [citation] has little, if any, value unless the parent is advised of the nature of the hearing giving rise to that opportunity, including what will be decided therein." (*In re Stacy T.* (1997) 52 Cal.App.4th 1415, 1424, italics omitted; cf. *Brianna S.*, *supra*, 60 Cal.App.5th at p. 315 [no prejudice from section 387 procedural error where appellant was "effectively accorded all of the process she was due under section 387" where DCFS "filed a supplemental petition with the appropriate content," appellant was afforded "the opportunity to argue against [DCFS's] request" at a timely hearing, and substantial evidence supported the allegations in the section 387 petition].) Had Mother and Father been given notice—via additional allegations in the section 387 petition—that DCFS was seeking a section 387 modification based on Father and Mother engaging in domestic violence in recent months and/or Alfredo H.'s attacks on Mother, Mother and/or Father may have offered argument or evidence on these issues. For example, they may have offered evidence bearing on the identity of "Jesus Duran" or additional evidence regarding Mother's efforts to protect her children following the attack and

---

[4] DCFS also did not allege continuing domestic violence between Mother and Father as a basis for C.L.'s detention from Mother before the section 387 hearing.

threats by Alfredo H. We cannot say that denying Mother such an opportunity was harmless, as Mother did not have reason to offer such evidence at the jurisdictional phase of the section 387 hearing, which focused solely on alleged violations of visitation orders and Father's access to the children. (See *Brianna S.*, *supra*, at p. 315.)

"The standard for removal from parental custody under section 361, subdivision (c)(1), is relevant only in a disposition hearing after the court has made true findings" as to the allegations in the section 387 petition. (*Javier G., supra*, 137 Cal.App.4th at p. 461.) Because we conclude that the court reversibly erred in concluding the allegations in the section 387 petition were true, we need not address the parties' arguments regarding the sufficiency of the evidence to support removal under section 361. Rather, we reverse both the court's order sustaining the section 387 petition and the court's order removing the children from Mother at the section 387 hearing.

### E. *ICWA Compliance*

Finally, Father asserts DCFS failed to inquire of C.L.'s extended family—including several specific paternal family members and the maternal grandmother—as to whether C.L. is or may be an "Indian child" under ICWA, requiring the dispositional orders to be conditionally affirmed and the matter remanded for ICWA compliance. DCFS does not dispute Father's contention that DCFS has not complied with its initial duty of inquiry under ICWA, nor does it argue that this failure was not prejudicial. (See § 224.2, subds. (a) & (b) [setting forth ICWA duty of inquiry].) Rather, the parties disagree as to the appropriate remedy for this failure to comply. We conclude that, because the juvenile court still has jurisdiction over C.L., as well

33

as an ongoing duty to ensure compliance with ICWA, we can
sufficiently address any failure by DCFS to comply with its ICWA
duties by directing the juvenile court to require that DCFS do so,
to the extent it has not already.[5]  (See, e.g., *In re A.C.* (2022) 75
Cal.App.5th 1009, 1018 [affirming jurisdictional and dispositional
orders with instructions that DCFS comply with ICWA duty
of inquiry]; see also *In re Baby Girl M.*, *supra*, 83 Cal.App.5th
at p. 639, fn. 2 ["[w]e see no need to order any ICWA findings
vacated because ICWA-related obligations are continuing duties;
that means earlier ICWA-related findings are subject to change
and no order vacating an earlier finding is necessary here"]; see
also *id.* at pp. 638–639 [where appeal from ongoing dependency
proceedings based solely on lack of sufficient ICWA inquiry, "all
[the Court of Appeal] could order in resolving th[e] appeal [was]
that [DCFS] and [the] juvenile court fulfill their inquiry and
notice obligations under ICWA"].)  The parties have not briefed
what specifically the ICWA duty of inquiry requires under the
circumstances of this case.  We thus do not consider the issue.

---

[5] Nor is Father's appeal moot as to the ICWA issue, as
was the appeal in *In re Baby Girl M.* (2022) 83 Cal.App.5th 635,
because here, unlike in that case, the record does not reflect that
DCFS is already remedying the alleged lack of sufficient inquiry,
or that the juvenile court has already ordered DCFS to do so.
(See *id.* at pp. 638–639 [concluding that, because DCFS was
already starting to fulfill inquiry and notice obligations, "there
is no effective relief we can now provide"].)

## DISPOSITION

The orders sustaining the section 387 petition and removing the children from Mother are reversed.  In all other respects, we affirm.

Upon remand, the juvenile court is directed to order DCFS to comply with the requirements of section 224.2 and California Rules of Court, rule 5.481(a) forthwith, to the extent it has not already.  The court shall conduct further proceedings in accordance with ICWA, if applicable.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:




CHANEY, J.




WEINGART, J.